IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MARY P. STINSON,                    *

      Plaintiff,                    *

vs.                                 *
                                        CASE NO. 4:10-CV-63 (CDL)
PUBLIC   SERVICE   TELEPHONE *
COMPANY, and JAMES L. BOND,
                                    *
      Defendants.

_____     *

O R D E R

      Plaintiff Mary Stinson ("Stinson") claims that her former

employer, Defendant Public Service Telephone Company ("Public

Service"), violated Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981

("§ 1981"), by terminating her employment because of her race,

subjecting her to a sexually hostile work environment, and

retaliating against her by filing a false report of criminal

activity.   Stinson also brings a claim for defamation under

Georgia law against her former supervisor, James Bond ("Bond"),

for making statements to various entities accusing Stinson of

criminal activity.   Public Service and Bond (collectively

"Defendants") filed a Motion for Summary Judgment (ECF No. 21),

which is presently pending before the Court.   For the following

reasons, the Court grants Defendants' motion as to Stinson's

Title VII and § 1981 claims.   The Court declines to exercise

supplemental jurisdiction over Stinson's state law defamation claim against Bond, and that claim is dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Stinson, are as follows.

## I. Stinson's Employment with Public Service

Stinson, a black female, worked for Public Service as a customer service representative ("CSR") from October 5, 1987 until her discharge on March 14, 2008. Public Service provides cable, internet, and phone services to its customers. Stinson

2

received customer payments, both cash and check, and posted them to customer accounts using the computer. Stinson Dep. 92:9-93:2, ECF No. 24. She also prepared bank deposits. *Id.* at 93:11-12. In addition to the individual computers specifically assigned to each CSR, Public Service had two computers at the customer walk up window. Stinson typically worked at one of the computers at the window.

## II. Stinson's Discriminatory Discharge Claims

### A. <u>Public Service's Initial Investigation of its Billing Records</u>

In January 2008, Public Service began an investigation of its customer billing records. Ingram Dep. Ex. 2, Memo to Records 1 (Feb. 29, 2008), ECF No. 48 [hereinafter Feb. Memo]. Public Service began the investigation because its Controller, Vernon Ingram ("Ingram"), discovered a revenue account number with a 74.7% decrease in revenue for the test year compared to the prior year during his preparation of a report for the Georgia Public Service Commission. *Id.* Upon examination of the Other Charges and Credits ("OCC") journals for the account in Public Service's computer billing program, which provided the source information for the computer entries for the account, Ingram found unexpected credit adjustments. *Id.* OCC credits are given to customers for adjustments on their bills. Brown Dep. 7:24-8:4, ECF No. 42. When Ingram discovered the decrease

3

in revenue he initially thought Darlene Brown ("Brown"), a white CSR, processed the unexpected credits. Ingram Dep. 36:4-6.

Ingram expanded his investigation to determine whether similar problems existed with other accounts. As part of the investigation, Bond retrieved cancelled checks from the bank for a large customer and traced the checks. J. Bond Dep. 14:15-18, ECF No. 41. That trace revealed that smaller customers' account balances were credited using the check from the large customer, and then an OCC credit was applied to the large customer's account for the amount of its payment. *Id.* at 14:18-22; *see also* Feb. Memo 2-3 (detailing the inconsistencies between the check payment amounts, the deposit records from the bank, and the payment receipt records from Public Service's computer billing program). According to Bond, applying the OCC credit to cover the payment of the large customer took money "out of Public Service Telephone's pocket" and gave it to the large customer. J. Bond Dep. 14:22-24.

Based on Ingram's initial findings, he had "grave concerns that [Stinson] through her batch and/or journal entries into our customer billing software, has misstated the facts as to when customers paid and the Company received payment on their accounts." Feb. Memo 3. Ingram concluded that "some customer payments were never recorded in [Public Service's] software as collections on accounts, but were used to cover amounts posted

to other customer's accounts." *Id.* Ingram further determined that "OCC credits on some customer's accounts were inappropriately recorded by [Stinson] in our software and that these same customers actually paid to the Company the same amount as was credited off their accounts." *Id.*

Ingram, Bond, and Kelly Bond held a meeting with Stinson to discuss the inconsistencies between her computer billing records and her bank deposit records. Stinson Dep. 82:2-5. Ingram told Stinson "they had [done] an investigation and he didn't like what he had seen." *Id.* at 82:18-19. Ingram asked Stinson to explain how she processed payments. *Id.* at 82:21. Stinson understood that Ingram "seemed to think that [she] had taken somebody else's check and give[n] it to people that didn't deserve it." *Id.* at 82:15-17. Bond explained to Stinson that Public Service had the bank make copies of her deposit slips, and he did not understand why she recorded small amounts of the checks when she filled out the deposit slips. *Id.* at 83:3-7. Bond told Stinson that he was going to investigate further, but if he did not like what he saw, he was going to have to let her go. *Id.* at 82:25-83:2. Stinson understood Public Service accused her of stealing money. *Id.* at 85:11-18. Bond, however, told Stinson that "[he] never said [she] stole anything." *Id.* at 85:6-16.

B.   Stinson's Termination

Continuing the investigation, Ingram reviewed the deposit records from the local bank for each CSR for the month of January.  Ingram Dep. 14:15-15:8.  Ingram then compared the bank deposit records with Public Service's payment receipt records. When comparing the deposit records with the payment receipt records, thirty-four of Stinson's payment receipt records did not match the deposits made to the bank.  Ingram Dep. Ex. 1, Memo to Records, Mar. 14, 2008, ECF No. 48 [hereinafter Mar. Memo].  Stinson was the only CSR with non-matching records for the month.  *Id.; see also* Ingram Dep. 15:9-13.  Two of the CSRs who were investigated were white and two were black.  *See* Mar. Memo (listing Aretha Williams, Stacia Ennis, Mary Stinson, and Janice Joiner as the CSRs investigated); Stinson Dep. 109:5-18 (noting the races of the other CSRs).  Ingram concluded that Stinson held customers' checks and used other customers' money to cover the payments in the computer system.  Mar. Memo.  At other times, according to Ingram's analysis, Stinson "[held] customers' bill stubs and us[ed] their money to cover other customers' payments in the computer system." *Id.*

Relying on Ingram's investigation, Bond terminated Stinson's employment.  Bond claimed that Stinson falsified records, meaning "she applied credits to other customers' accounts without using the customers' money to actually pay the

bill." J. Bond Dep. 15:3-8. Bond terminated Stinson because "the records had been falsified as to where the money was coming from." *Id.* at 15:9-14. Bond concluded Stinson was responsible for the falsified records because she "filled out every one of the deposit slips that . . . went into the bank and . . . the OCC credits were done from [Stinson's] computer." *Id.* at 15:15-19. Prior to terminating Stinson, Bond had Ingram thoroughly explain his investigation and analysis. *Id.* at 15:20-23. Bond based his decision on the month review and "made the best decision [he] could make with the information that [he] had." *Id.* at 24:7-15.

After Stinson's termination, Ingram continued to investigate the extent to which Public Service's records had been falsified. Ingram and several other employees that he supervised compared the information from Public Service's billing program to the bank deposit records. Ingram Dep. 11:6-17. Ingram compiled spreadsheets extending back to 2006 and analyzed any bank deposit record that Public Service received. Ingram looked at records from other CSRs when they appeared problematic. *Id.* at 16:11-25. Ingram found thousands of records altered by Stinson where she "[a]ccept[ed] a customer's payment, sen[t] their check to the bank and [did] not credit[] their account at the same time." *Id.* at 37:13-19; *see also* Ingram Dep. Ex. 4, CB & T Altered R., ECF No. 49 (showing

examples of payment records altered by Stinson); Ingram Dep. Ex. 4, Public Service R. Ex. 22, ECF No. 49 (showing records Stinson entered into Public Service's billing software as pending toll-credits, and Public Service linked 92% of the pending toll-credits to deposits Stinson made, but none of the entries could be identified by Public Service as actual pending toll-credits due to any customer on any disputed toll bill); Ingram Dep. Ex. 4, Public Service R. Ex. 23, ECF No. 49 (showing records Stinson entered into Public Service's billing software as pending toll-credits, and Public Service linked 99% of the pending toll-credits to deposits Stinson made, but none of the entries could be identified by Public Service as actual pending toll-credits due to any customer on any disputed toll bill). One of Ingram's spreadsheets shows that white CSRs accepted cash that was not deposited with the bank. *See* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. [hereinafter Pl.'s Resp.] Ex. 22, Payment Rs., ECF Nos. 32-35 (showing white CSRs accepted cash that was not deposited to the bank). One of Ingram's documents had Stacia Ennis's ("Ennis") name on it, but Stinson filled out the deposit slip that went to the bank. J. Bond. Dep. 45:17-21.

Ingram discovered that the test version of Public Service's billing software allowed someone to process credits on a customer's account as if the customer had made a regular payment by using a memo entry. Ingram Dep. 8:1-21. According to

Stinson, she does not know what a memo entry is and never knowingly used this feature.  Pl.'s Resp. Attach. 1, Stinson Aff. ¶ 10, ECF No. 28-1.

C.  Stinson's Explanations for the Inconsistencies in the Computer Records

Plaintiff denies that she ever stole money from Public Service, falsified customer payment records, or engaged in "kiting."  *Id.* ¶ 14.  She points to the following facts in support of her contention that any inconsistencies did not justify her termination.

Public Service's accountant, Amy Lloyd ("Lloyd"), never saw Stinson steal anything from Public Service.  Lloyd Dep. 5:20-22, ECF No. 47.  Lloyd's responsibilities included comparing the deposit slips to the journal entries.  *Id.* at 7:9-17.  She never discovered anything indicating that someone was taking money from Public Service.  *Id.* at 7:18-21.  Lloyd double checked balances comparing the amount of a customer's payment and the deposit made to the bank.  Lloyd Dep. 8:17-9:7; *see also* J. Bond Dep. 23:14-24:1.  Lloyd did not know of any audit finding that Stinson did anything improper.  Lloyd Dep. 8:2-4.  No customer ever complained about not receiving credit for paying a bill. J. Bond. Dep. 14:6-10.

Stinson also points out that before Public Service switched to a new billing program, it had a separate billing system for

its cable service and its telephone service.  Ingram Dep. 22:7-9.  Sometimes customers paid for both services with one check, and the CSR "split" the check to pay both bills.  *Id.* at 22:9-14.  Splitting checks required the CSR to post the payment to either the cable or telephone account, make it look like the customer was due change on that account, and then use the change to make the payment to the other account.  Warner Dep. 52:22-53:4, ECF No. 43.  CSRs also split checks if a customer paid with one check for several different businesses, and the CSR would cash the check and put the right amount in the receipts for the individual businesses.  Ennis Dep. 9:7-10, ECF No. 38.  Ingram knew check splitting occurred and understood why it happened.  Ingram Dep. 21:25-22:4.  Both white and black CSRs engaged in check splitting.  *Id.* at 23:12-22.  The computer records from the other CSRs, who were both white and black, did not match the deposit slips submitted to the bank on an almost daily basis because the CSRs processed checks that paid for multiple services.  Stinson Dep.  108:13-110:22.

Stinson also maintains that if she left the computer at the walk up window and a customer came to Public Service to make a payment, another CSR used her computer to take the payment. Ennis Dep. 9:20-24.  The CSR taking the payment did not enter her own password into the computer because Stinson often left the computer open with her password already entered.  *Id.* at

10

10:2-12.  Every day the other CSRs used the front computer to enter payments while it was logged on with Stinson's password. Brown Dep. 29:17-30:14.   On one occasion, Public Service's records reflected transactions made by Stinson on a day she was on vacation.  Thompson Dep. 29:6-30:1, ECF No. 54.  Bond did not "know that any other CSR's had access to her computer," but he did know that CSRs left the computers at the walk up window open and other CSRs then used them to take payments from customers. J. Bond Dep. 9:3-10.  Bond considered the access by the other CSRs to the front computer to make payments to be a different process than what concerned him during the investigation.  *Id.* at 15:15-16:8.  According to Ingram, the fact that other CSRs keyed in payments using Stinson's password had "very little effect" on his analysis of the various accounts if the CSR did not also make up the deposit slip to the bank.  Ingram Dep. 37:5-12.

Stinson points to a statement by Ingram as evidence of his racial animus.  According to Stinson, in 2007 when discussing a customer's account, Ingram told her that he "caught a black stealing" when he worked at another company, and then he said "[as] a matter of fact, it was two."  Stinson Dep. 65:16-19, 66:9-10.

11

## III. Stinson's Retaliation Claims

Stinson's retaliation claims arise from Defendants alleged reporting that she engaged in criminal activity to the sheriff and the Georgia Bureau of Investigation ("GBI"). After reviewing Public Service's records for approximately six months, Bond contacted the local sheriff, who referred the case to the GBI on October 20, 2008. J. Bond Dep. 17:4-14; Pl.'s Resp. Ex. 6, GBI Face Sheet, ECF No. 31-2 at 2 of 7 [hereinafter GBI Face Sheet]. Bond told the GBI that Public Service was "missing money" and that Public Service dismissed Stinson for "mishandling the funds." J. Bond Dep. 18:6-10. Bond never told the GBI that Stinson stole money. *Id.* at 18:3-5. The GBI interviewed Stinson during its investigation. Stinson Dep. 24:7-10.

Public Service also submitted a proof of loss form with its insurance carrier for $165,943.03 on November 12, 2008. J. Bond Dep. Ex. 1, Proof of Loss 1-2, ECF No. 41. Bond attested in the proof of loss form that Stinson "kited customer payments and resorted to reversing certain customer billing on the company's books, writing off accounts she collected and stole, and issuing memo collections journals to help cover up her stealing of company receipts." *Id.* Bond filed the insurance claim based on Ingram's findings and an extensive review by outside auditors

that confirmed money was missing.  J. Bond Dep. 22:1-8.  The insurance company paid Public Service's claim.  *Id.* at 21:8-9.

## IV.   Stinson's Hostile Work Environment Claims Based on Sex

In addition to her discriminatory termination and retaliation claims, Stinson claims Public Service subjected her to a hostile work environment based on sex.  Her allegations are based on the conduct of Bond, who became her immediate supervisor in 2006.  Stinson Dep. 97:22-25.  Bond's alleged offensive conduct included the following.  Stinson saw Bond behind a shed at work talking with Christie Windham ("Windham"), and Bond said he had to appear in court because Windham's husband suspected they were seeing each other.  *Id.* at 21:15-20, 22:8-13.  Stinson saw Brown and Bond massaging each other's shoulders in the conference room ten to twenty times during the middle and end of her employment.  *Id.* at 35:9-23; *see also* Bond Dep. 51:9-14.  On one occasion, Stinson witnessed Bond and Brown kissing in the break room with the lights off.  Stinson Dep. 36:4-12.  Brown stayed in Bond's office for thirty minutes at a time on some days and on other days stayed for longer than an hour and a half.  *Id.* at 19:5-10.  Bond allowed Brown to come to work late, talk on the cellphone, and leave work without permission.  *Id.* at 14:21-17:2.

During the middle of Stinson's employment, Bond commented that a woman he was dating "gave him sex," and "just about every

week he had something to say about sex." *Id.* at 42:1-21.  Bond also said that he was letting his beard grow out because his wife refused him sex, and he was not going to shave his beard until she gave him sex.  *Id.* at 39:21-40:3.  Bond told the women in the office he had a "tattoo on [his] behind."  Bond Dep. 51:21-25.

About five to ten times during Stinson's employment, Bond came up behind her and touched her shoulders and his hand stayed on her shoulders.  Stinson Dep. 43:4-19.  Stinson told him to "go on" and he would laugh.  *Id.* at 43:20-23.  Bond "loved rubber bands and would shoot them all the time," and he shot Stinson from time to time.  *Id.* at 45:19-46:5.  On one occasion, Bond shot Stinson with a rubber band and it hit her on her breast.  *Id.* at 46:14-19.  Bond sprayed Stinson's hair with WD-40, and Stinson took off her shoe and threw it at him.  *Id.* at 47:12-19.

Stinson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 23, 2008. Stinson Dep. Ex. 6, Charge of Discrimination, ECF No. 24 [hereinafter EEOC Charge].  The EEOC issued Stinson a right-to-sue letter on March 16, 2010.  Compl. Attach. 1, Dismissal and Notice of Rights, ECF No. 1-1.

DISCUSSION

Stinson alleges that Public Service discriminated against her by terminating her employment based on her race, retaliating against her for filing a charge of discrimination with the EEOC, and subjecting her to a hostile work environment based on sex. The Court finds that any other federal law claims asserted by Stinson have either been withdrawn, abandoned, or raised for the first time in her summary judgment briefing. Accordingly, those claims may not be considered by the Court. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

I. **Stinson's Discriminatory Discharge Claims**

"The crux of Plaintiff's claim is that she was discriminatorily discharged." Pl.'s Resp. 4. Because Stinson lacks direct evidence to support her discriminatory discharge claims, the Court evaluates her claims under Title VII and § 1981 using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *E.g., Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *see also McCray v. Wal-Mart Stores, Inc.*, 377 F. App'x 921, 923 (11th Cir. 2010) (per curiam) (noting that discrimination claims under § 1981 are governed by the same

standards of proof and the same analytical framework as Title VII claims). To establish a prima facie case of discrimination, Stinson must show that: "(1) [s]he is a member of a protected class; (2) [s]he was subjected to [an] adverse employment action; (3) [her] employer treated similarly situated employees outside of [her protected] class more favorably; and (4) [s]he was qualified to do the job." *Floyd v. Fed. Express Corp.*, 423 F. App'x 924, 929-30 (11th Cir. 2011) (per curiam). "To determine whether employees are similarly situated in a case involving discriminatory discipline, we evaluate whether the employees were accused of the same or similar misconduct and were disciplined differently." *Id.* at 930. "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to the disciplined employee's misconduct. *Id.* (internal quotation marks omitted). Once the plaintiff establishes a prima facie case, the employer can rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for its action. *Alvarez*, 610 F.3d at 1264. If the employer offers a legitimate non-discriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the employer's proffered reason is pretext for discrimination. *Id.*

A.   Stinson's Prima Facie Case

Public Service argues that Stinson cannot establish a prima facie case because no CSR outside of her protected class engaged in misconduct comparable to Stinson, and thus she cannot establish that Public Service treated similarly situated individuals outside of Stinson's protected class more favorably. Stinson claims that Public Service's continued investigation into its billing records revealed that white CSRs engaged in the same conduct as Stinson.   Stinson claims that six white CSRs accepted cash that was not deposited to the bank, but Public Service did not terminate them.   *See* Pl.'s Resp. Ex. 22, Payment Records, ECF Nos. 32-35 (showing white CSRs accepted cash that was not deposited to the bank).   Although Stinson's evidence shows that white CSRs accepted cash payments from customers that were not deposited to the bank, Defendants maintain that the evidence does not demonstrate that the CSR accepting the cash did not put it in the drawer to be deposited.   J. Bond Dep. 26:5-9.   Public Service accused Stinson of falsifying records, meaning "she applied credits to other customers' accounts without using the customers' money to actually pay the bill," and she falsified her records as to where the money was coming from.   *Id.* at 15:3-14.   Bond concluded that Stinson falsified records because she "filled out every one of the deposit slips that . . . went into the bank and . . . the OCC credits were

done from [Stinson's] computer." *Id.* at 15:15-19.  Stinson's evidence does not show whether the computer records of the white CSRs failed to match the bank deposit records they submitted, and thus Stinson's evidence fails to demonstrate that white CSRs engaged in comparable misconduct but were not terminated by Public Service.

Stinson also claims that white CSRs engaged in check splitting but Public Service did not fire them.  CSRs split a customer's check to pay for both cable and phone services or split a customer's check to pay the bills for multiple businesses owned by that customer.  Public Service, however, did not accuse Stinson of check splitting and instead accused her of falsifying records.  Therefore, evidence that white CSRs engaged in the practice of check splitting does not establish that white CSRs engaged in misconduct comparable to Stinson.

Finally, Stinson stated in her deposition that the computer records of white CSRs did not match the deposit slips submitted to the bank on an almost daily basis, Stinson Dep. 108:14-111:1, and everyone else followed the same procedure she did when they processed payments, *id.* at 111:13-16.  Stinson's testimony, however, indicates the records did not match because the white CSRs engaged in check splitting, *id.* at 110:9-17, or occasionally did not sign in to the computer correctly, resulting in inaccurate records, *id.* at 109:19-25.  The Court

finds that this testimony does not establish that white CSRs falsified records.  Instead, the record establishes that they engaged in check splitting or occasionally made mistakes during the log-in process.   The Court concludes that Stinson has failed to show that Public Service treated similarly situated individuals outside of her protected class more favorably, and therefore she has not established a prima facie case of discrimination.[1]

> B.   Public Service's Legitimate Non-Discriminatory Reason and Pretext

Even if Stinson established a prima facie case of discrimination, Public Service articulated a legitimate non-discriminatory reason for Stinson's termination, and Stinson has failed to produce evidence that the reason was a pretext for discrimination.  Public Service has consistently maintained that its investigation of Stinson's computer billing records compared to her deposit slips demonstrated that she falsified customer account records.   Stinson responds that a question of fact exists regarding whether Bond's stated reason for her termination is false because she maintains that she never falsified records.  Stinson Aff. ¶¶ 2, 14.  The question for the Court, however, is whether Stinson's evidence creates a question of fact regarding whether Bond believed Stinson to be guilty of

---

[1] Stinson does not argue Public Service replaced her with an individual outside of her protected class.

falsifying records, and whether this belief was the reason for her discharge. *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Stinson's assertions of innocence alone fail to create a question of fact that Bond's reason is unworthy of credence. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam) ("[W]here the employer produces . . . documentary evidence of misconduct . . . that demonstrate[s] poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment"). Stinson also attempts to create a fact dispute regarding pretext by offering evidence that another Public Service employee could have made the inaccurate computer entries using her password. The inquiry into pretext, however, "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266. "The question is whether her employer[] [was] dissatisfied with her for [this] or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [Stinson] as cover for discriminating against her because of her [race]." *Id.* Stinson's evidence that other CSRs *could* have entered the inconsistent records into the computer does not create a question of fact as to pretext where the evidence fails to demonstrate that Bond did not believe Stinson made the entries

where her name appeared in Public Service's billing program. Further, Bond relied on the comparison between Stinson's deposit slips and her computer billing records when deciding to terminate her, J. Bond Dep. 15:15-19, and Bond did not base his decision on computer entries alone, *id.* Accordingly, the Court concludes the evidence relied on by Stinson to show pretext fails to create a fact dispute on this issue.

The Court rejects Stinson's argument that the conduct of other CSRs, who were white, supports a finding of pretext. As previously explained, Stinson's evidence of the white CSRs' conduct fails to demonstrate that they engaged in misconduct comparable to Stinson. Therefore, that evidence does not create a question of fact as to pretext. Further, even if the Court concluded that Public Service treated similarly situated CSRs who had inconsistent payment records differently, Stinson acknowledged that both black and white CSRs entered inconsistent records and that Public Service did not terminate them. Stinson Dep. 108:13-111:1. Therefore, no evidence exists that Public Service treated other employees differently because of their race.

Stinson further asserts that she did not steal any money from Public Service. Stinson argues Bond's statement that he "never said [Stinson] stole any money" creates a question of fact that his reason for her termination was pretext for

discrimination.  J. Bond. Dep. 16:18-20.  Stinson also offers evidence that she was not the only one to blame for any missing funds.  *See* Pl.'s Resp. Attach. 3, Thompson Aff. ¶¶ 3, 5-6, ECF No. 28-3.  This evidence does not create a factual dispute as to whether Bond's articulated reason for the termination was pretextual.  Bond stated he terminated Stinson for *falsifying records,* not for *stealing money.*  Whether he never said she stole money or whether someone else may have also been responsible for missing funds is not probative of whether Bond's reason for terminating her employment, falsifying records, was a pretext for racial discrimination.[2]

Finally, the Court concludes that Ingram's statement that he "caught a black stealing," Stinson Dep. 65:18, does not create a question of fact regarding whether he conducted a biased investigation of Stinson resulting in her termination. Ingram investigated all CSRs for one month, both black and white, and Stinson was the only CSR with non-matching records. Mar. Memo.  Bond relied on the results of the one month review, including the review of another black CSR, to make his decision

---

[2] The Court notes that Bond did attest in Public Service's proof of loss with its insurance company that Stinson did steal money.  Proof of Loss 1.  Bond submitted this document, however, after outside auditors investigated and reviewed Public Service's records and confirmed that money was missing.  J. Bond Dep. 22:1-8.  Thus, Bond's later statement that she did steal money does not create a question of fact regarding whether his reason for her termination that she falsified records was pretext for discrimination.

to terminate Stinson.   Stinson offers no evidence indicating that Ingram altered these findings in any way, and her evidence demonstrates nothing beyond the mere possibility for Ingram to alter the records.   *See* Thompson Aff. ¶ 9.   The Court cannot conclude based on Ingram's statement that a question of fact exists regarding whether he conducted a biased investigation of Stinson because of her race where the evidence reveals Ingram investigated black and white CSRs and Stinson alone had non-matching records.   Moreover, Stinson's allegations of insurance fraud by Bond and Ingram are not supported by any evidence in the record beyond mere speculation.   In sum, the Court finds that Stinson's evidence does not create a genuine dispute as to whether Public Service's reason for her termination was pretext for discrimination.[3]

For all of the reasons explained above, the Court grants summary judgment to Public Service on Stinson's disparate treatment claims under Title VII and § 1981.

## II.  Stinson's Retaliation Claims

Stinson contends that Public Service retaliated against her for filing a charge of discrimination with the EEOC when it

---

[3] Stinson submitted evidence regarding alleged discrimination by Public Service in granting leave for her to attend school.   Stinson argues this evidence shows the type of discrimination that led to her discharge.   After reviewing this evidence, the Court concludes that it fails to create a question of fact regarding whether Public Service terminated her employment because of her race.

filed an alleged false report of criminal activity with the sheriff's department and the GBI.   To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.   *Freeman v. City of Riverdale*, 330 F. App'x 863, 867 (11th Cir. 2009) (per curiam).

Public Service argues that Stinson cannot establish a prima facie case of retaliation because no causal connection exists between her EEOC charge and any adverse employment action by Public Service.   Stinson argues a causal connection exists based on temporal proximity between her EEOC charge and Public Service's report of criminal activity to the sheriff's office and the GBI.   "Mere temporal proximity . . . between knowledge of protected activity and an adverse . . . action . . . must be very close."   *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (internal quotation marks omitted) (alterations in original).   "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."   *Id.*   Stinson makes the conclusory allegation that Public Service filed the report of criminal activity "[w]ithin days" after she filed her EEOC charge, Pl.'s Resp. 17, but she offers no evidence of the amount

of time that actually transpired between the dates of the charge and the report.   The evidence in the record establishes that Stinson filed her EEOC charge on April 23, 2008.   EEOC Charge. The record also reveals that Bond called the sheriff and the sheriff referred him to the GBI.   Bond Dep. 17:4-14.   The GBI received the request to investigate from the sheriff on October 20, 2008, GBI Face Sheet, approximately six months after Stinson filed her EEOC charge.   Temporal proximity of six months between Stinson's EEOC charge and the report is not sufficiently close to support an inference that the two are causally connected. *See Higdon*, 393 F.3d at 1221 (finding that a three month period between the protected expression and the adverse action insufficient to establish a causal connection between the two events).   Any claim by Stinson that Public Service retaliated against her by filing the proof of loss with its insurance company fails for the same reason because the record demonstrates Public Service submitted the proof of loss on November 12, 2008.   Proof of Loss 2.   Stinson has not presented any other evidence of causation, and thus she has failed to establish a prima facie case of retaliation under Title VII or § 1981.   Accordingly, Public Service is entitled to summary judgment on Stinson's retaliation claims.

## III. Stinson's Hostile Work Environment Claim Based on Sex

Stinson claims Public Service subjected her to a hostile work environment based on sex. To establish a hostile work environment claim based on sex, Stinson must demonstrate that: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). When determining whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment, the Court considers: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* at 1246.

Stinson offers the following evidence in support of her hostile work environment claim: (1) Bond's preferential treatment of Brown; (2) one instance where Stinson saw Brown and Bond kissing; (3) Stinson saw Brown and Bond massaging each other's shoulders ten to twenty times; (4) Bond shot rubber bands at Stinson multiple times, and once a rubber band hit her

26

on the breast; (5) Bond sprayed Stinson's hair with WD-40; (6) Bond touched Stinson on the shoulder five to ten times; (7) Bond's statement that Windham's husband thought Windham and Bond were seeing each other; (8) Bond's statement that a woman he was dating gave him sex; (9) Bond's statement that his wife would not give him sex, and he was growing out his beard until she did; and (10) Bond's statement that he had a tattoo on his behind.

First, the Court concludes that Stinson's evidence that Bond gave Brown preferential treatment does not support Stinson's hostile work environment claims.  In order for Stinson to meet her prima facie case of hostile work environment, she must demonstrate that the unwelcome harassment was based on her sex.  An isolated incident of preferential treatment of a paramour because of a consensual relationship does not constitute harassment based on sex.  *See Womack v. Runyon*, 147 F.3d 1298, 1299-1301 (11th Cir. 1998) (per curiam) ("An isolated instance of favoritism toward a 'paramour' . . . may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.") (quoting EEOC Policy Guideline on Employer

Liability Under Title VII for Sexual Favoritism, EEOC Notice No. 915-048 (Jan. 12, 1990)).[4]

The Court concludes that Stinson's remaining evidence, occurring over a period of several years, is not sufficiently severe or pervasive to alter the terms and conditions of her employment. The incidents where Bond shot rubber bands at Stinson and sprayed her hair with WD-40 involved horseplay, and the five to ten times Bond touched her shoulders involved fairly innocuous physical contact. *See Mitchell v. Pope*, 189 F. App'x 911, 913 (11th Cir. 2006) (per curiam) (finding conduct that involved horseplay or was not sex-based insufficient to establish a prima facie case of sexual harassment). Although Stinson claims Bond commented about sex "just about every week," Stinson Dep. 42:18-21, she only identified a handful of specific comments by Bond relating to sex, and they constitute mere offensive utterances. Finally, Stinson's evidence that she once saw Bond and Brown kissing in the break room and saw them massaging each other's shoulders ten to twenty times, although inappropriate office conduct, are not instances sufficiently severe or frequent to alter the conditions of Stinson's employment. Accordingly, the Court concludes that Public

---

[4] Although Stinson claims that widespread favoritism can create a hostile work environment based on sex, Stinson's evidence only demonstrates favoritism towards Brown, which the Court concludes constitutes an isolated incident of favoritism towards a paramour.

Service is entitled to summary judgment on Stinson's hostile work environment claim.

CONCLUSION

For the reasons explained above, the Court grants Public Service's Motion for Summary Judgment (ECF No. 21) as to Stinson's Title VII and § 1981 disparate treatment, retaliation, and hostile work environment claims. The Court declines to exercise supplemental jurisdiction over Stinson's state law defamation claim, and that claim is dismissed without prejudice.

IT IS SO ORDERED, this 29th day of December, 2011.

S/Clay D. Land
_____
          CLAY D. LAND
   UNITED STATES DISTRICT JUDGE